## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **FEDERICO DIMAS** ) | |
| **3125 Patrick Henry Drive, Unit 225** ) | |
| **Falls Church, VA 22044-2314** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | **Case No._____** |
| **v.** ) | |
| ) | |
| **MERRICK B. GARLAND** ) | |
| **Attorney General,** ) | |
| **U.S. Department of Justice/DEA, Agency** ) | |
| **950 Pennsylvania Avenue NW,** ) | |
| **Washington, DC 20530-0001** ) | |
| ) | |
| **Defendant** ) | |
| _____ ) | |

## COMPLAINT

Plaintiff, Federico Dimas ("Mr. Dimas" or "Plaintiff"), by and through his undersigned

Counsel, files this Complaint against Defendants Merrick Garland, Attorney General, DOJ/DEA

("Defendant" or ("DOJ"),

## NATURE OF ACTION

This is an action under Title VII of the Civil Rights Act, of 1964, as amended, to correct

unlawful employment practices and to provide appropriate relief to Plaintiff Mr. Federico Dimas,

who is a Hispanic male, from Mexico, and an employee of the DEA/Agency, who was adversely

affected by such practices. As alleged with greater particularity below, Mr. Dimas claims that he

was discriminated against, and continuously harassed, and that Defendant through its employees,

management supervisors, representatives, and agents, acted against him, consistently and

continuously created an unacceptable and intolerable hostile work environment for him to work

in, because of his race, national origin, color, sex, and for retaliating against him, because of his

prior EEO activities against his superiors. Specifically, Agency discriminated, and retaliated

against him, when he was notified on February 3, 2017, that he would no longer be eligible for

promotion, transfer, award, or nomination to the position of Field Trainer or Counselor for three

years; and when he was suspended for an 11-day suspension without pay, from February 6-17,

2017; and when he was denied promotion to the position of Information technology Specialist,

GS-2210-14, Vacancy announcement No. H-IG-16-1598835-MP-JSD. Mr. Dimas also claims

hostility and harassment by Agency officials, and that their actions, created a hostile work

environment for him. He claims that the harassment and hostility had been in a consistent and

continuous pattern for years, that started before the relevant claims in this action, and has

continued through to-date.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 28 U.S. Code §1332.

2.      This Court has personal jurisdiction over Defendant.

3.       Venue is proper in this Court, pursuant to 28 U.S.C. § 1391.

4.      Plaintiff exhausted all his Administrative Remedies, before bringing this action. **See
        Exhibit A.**

## PARTIES

**Plaintiff:**

5.       Mr. Dimas is a citizen of the State of Virginia, and a resident who is domiciled in Falls

Church Virginia. He is employed by the Drug Enforcement Administration ("DEA") as

Information Security Specialist.

**Defendant:**

6.      Defendant, is the Attorney General of the Department of Justice, a federal Agency of the United States. The DEA is part of the Department of Justice.

## FACTS

**Background Information**

7.      Mr. Dimas is an army veteran who served his country for 22 years, on active-military duty in the United States Army, from April 1976 through April 1998. Mr. Dimas retired at the United States Army Military Police School ("USAMPS") in Fort McClellan, Alabama, with an honorable discharge.

8.      Mr. Dimas started working for the DEA on August 15, 1999, and since then has been assigned to the Cybersecurity Services Section/ TCVV ("CSS"). He has also been assigned as a Computer Specialist GS-0334-13, and Information Technology Specialist ("INFOSEC") GS-2210-13, working for the Cybersecurity Investigation and Response Unit/ TCVV ("CIRU"), Cybersecurity Assessment Unit ("CAU"), and Policy and Compliance Unit ("PCU").

9.      At the time Mr. Dimas filed his EEO Complaint, he has served the Drug Enforcement Administration ("DEA"), for eighteen (18) years and one month, as Information Security Specialist. His immediate supervisor at that time was Thomas Gregg, who was the Unit Chief.

**Family Oriented**

10.     For a while, Mr. Dimas and his wife who is a Korean American, like many American couples, were having private, marital problems, that prompted the couple to live separately. On February 14, 2016, Mr. Dimas and his wife separated, and Mr. Dimas moved out of their marital home. They remain separated, to-date.

11.Mr. Dimas is a family-oriented man. Though separated, Mr. Dimas have been paying spousal support to his wife, and child support for his granddaughter, until since her granddaughter started living with him.

12.     He and his wife have two adult daughters (one recently married), and a 15-year-old granddaughter, who is in school, and presently lives with Mr. Dimas, and who visits her disabled mother, and grandmother, every weekend.

13.     Mr. Dimas drops his granddaughter to school, before going to work, and picks her up after school. He also drops her off to her mother and grandmother every weekend, and picks her up on Sundays.

**About This Action**

14.     On June 30, 2017, Mr. Dimas filed his EEO Complaint. On February 5, 2018 he received the Report of Investigation ("ROI"). During this time the TCVV Section was under the Inspections Division (IG) Office of Security Programs (IS) until it moved to the Office of Information Systems (TC) on April 2, 2018.

15.     Mr. Dimas claims that he submitted that he was discriminated against, by his superiors and Agency, because of his race, (Hispanic), sex/gender (male), national origin (Mexican American), and reprisal or retaliation. Prior to filing the EEO Complaint that culminated in this action, Mr. Dimas had filed pro se, prior EEO Complaints, against Agency, which were ruled against him, because, of his improperly prepared complaint due to lack of basic legal knowledge, and the fact that he was unable to retain counsel, at that time.

16.     Some of the people and names of the management officials named in Mr. Dimas EEO Complaint that culminated in this action, are the same as some of those named in his prior EEO activity documents, that are part of his employment file.

17.     In his 2011, EEO Complaint, the following officials, who Mr. Dimas named as actors in his discrimination claim against Agency, are also named in his current suit, as those who conspired to, or took part in discriminating against him, on the bases, stated in this action:

4

Thomas G. Gregg, III (GS-14) Acting Unit Chief when Unit Chief is Out of the Office;

Michael L. McCormick GS-16) Associate Deputy Chief Inspector (ADCI) (Retired October 2017, working for DEA), Third Line Supervisor;

Richard D. Bendekovic (GS-15) Associate Deputy Chief Inspector (ADCI) (Retired, working for DEA); and

Daryl W. Himes (GS-14) EEO Office Manager.

18.     In his 2012, EEO Complaint, the following officials, who Mr. Dimas named as actors in his discrimination claim against Agency, are also named in his current suit, as those who conspired to, or took part in discriminating against him, on the bases stated in this action:

Thomas G. Gregg, III (GS-14) Acting Unit Chief when Unit Chief is Out of the Office;

Michael L. McCormick GS-16) Associate Deputy Chief Inspector (ADCI) (Retired October 2017, working for DEA), Third Line Supervisor;

Richard D. Bendekovic (GS-15) Associate Deputy Chief Inspector (ADCI) (Retired, working for DEA); and

Christopher Quaglino (Promotion GS-15, September 14, 2012) Office of Professional Responsibility.

19.     For a long time, the same people who were in highly superior positions, and had enormous supervisory power and control over Mr. Dimas, and who decided whether or not Mr. Dimas progressed in his career or not, made sure he did not. As a result, even though they had no problem with his ability to do his work, as all his performance evaluations since he stated working for Agency show, he was denied every application for promotion that he applied for.

20.     It did not help Mr. Dimas that he had the temerity to complain against them to the EEO, not once, but more than once, which he had absolute right to do. As a result, of his prior EEO activities, Mr. Dimas literally became a "black listed" employee, to the effect, that no matter how qualified he is or how deserving he is for a promotion, the above-named superiors made sure he

never gets it. He was never good as his, non-Hispanic, white Caucasian American, male and female coworkers, who were promoted over Mr. Dimas, irrespective of their job tenure, experience on the job, or qualified for the promotion.

21.     Since August 15, 1999 when Mr. Dimas started working for the Agency, and was assigned to the Cybersecurity Services Section, and Cybersecurity Investigation and Response Unit, he has applied for all the advertised GS-2210-14 job positions.

22.     During the twenty-two (22) years working for the DEA, under the leadership and supervision of people like Thomas G. Gregg, Michael L. McCormick, Christopher Quaglino, Richard D. Bendekovic, Sean Vereault Brian M. McKnight, William C. Follin, Bret M. Stevens, and Kurt Lund, to name a few, including those now retired, and for about fifteen (15) times, Mr. Dimas applied for advertised job positions for promotion to grade GS-2210-14, in and though qualified, and experienced, "Referred, Eligible, and Qualified," Agency, through its management officials, always discriminatorily and retaliatorily, passed Mr. Dimas over, in favor of a non-Hispanic or non-Mexican, white Caucasian American Agency employee.

23.     Sometime, though the advertised position is in Mr. Dimas' unit or section, the selectee or Agency employee promoted, is brought in or handpicked by Mr. Dimas' superiors, from another Unit or Section, to take the position that they denied Mr. Dimas, in his own section or unit.

24.     For twenty-two (22) years working for the DEA, under the leadership and supervision of people like Thomas G. Gregg, Michael L. McCormick, Christopher Quaglino, Richard D. Bendekovic, Sean Vereault Brian M. McKnight, William C. Follin, Bret M. Stevens, and Kurt Lund, to name a few, including those now retired, Mr. Dimas has been stagnantly stuck at the GS-13 position, because he is race, sex, national origin, and retaliation.

25.     The Agency, its managers, supervisors, and management officials, who were also Mr.

Dimas' superiors, for at where so full of discriminatory animus that they were never able to see

that there was something wrong in not promoting one of their employees, for twenty-two (22)

years, despite his annual performance appraisal ratings being "Excellent" or "Outstanding" each

year, for those twenty-two (22) years was always.

26.     For twenty-two (22) years Agency, through Thomas G. Gregg, Michael L. McCormick,

Christopher Quaglino, Richard D. Bendekovic, Sean Vereault Brian M. McKnight, William C.

Follin, Bret M. Stevens, and Kurt Lund, and others, including those now retired, abused their

supervisory powers over Mr. Dimas, by discriminatorily prevented him from enjoying equal

employment opportunities and privileges.

27.     Agency, through Thomas G. Gregg, Michael L. McCormick, Christopher Quaglino,

Richard D. Bendekovic, Sean Vereault Brian M. McKnight, William C. Follin, Bret M. Stevens,

and Kurt Lund, and others, including those now retired, engaged in discriminatory, and

retaliatory practices against Mr. Dimas

28.     In February 2017, Brian M. McKnight (SES), became Acting Chief Inspector (IG), and

Mr. Dimas' fifth level supervisor (Started January 17, 2017). One of McKnight's first actions

was a memo titled: "Eligibility for Promotion, Transfer, Awards and Nominations to the Position

of Field Trainer or Counselor (DFN:060-01) that he gave to Mr. Dimas, telling him that he will

not be eligible for those, until after three (3) because Mr. Dimas was an employee "who have

sustained charges of misconduct resulting in discipline."

29.     At the time of Brian McKnight's promotion to Acting Chief Inspector, Inspections

Division, he was, to also continue to serve as the Deputy Chief Inspector, Office of Professional

Responsibility Inspections Division - the same Office of Professional Responsibility, which

McKnight was the deputy, is the same one McKnight claims the alleged misconduct of Mr.

Dimas reported on March 7, 2016, was submitted to  - "the Board of Professional Conduct

(HRB) on October 31, 2016, by the Office of Professional Responsibility."

**Disciplinary actions**

30.      For the twenty-two (22) years Mr. Dimas worked for the DEA, he has been suspended

twice. On one occasion, Mr. Dimas, was suspended for one (1) day, because he asked a white,

Caucasian female coworker if she would like to go to lunch with him the female employee said

no, and so, Mr. Dimas went to lunch without her, and without saying anything to her.

31.      Later, Mr. Dimas found out that his female coworker had told their supervisor that Dimas

asked her out to lunch and whatever else. As a result, Mr. Dimas was given a 3-day notice of

suspension without pay, which was later reduced to a 1-day suspension without day, by then

deciding officer, Larry Reaves.

32.      The second occasion, was the unwarranted discriminatory and retaliatory animus-fueled

14-day suspension without pay, which was reduced to 11-day suspension, which is part of the

adverse action claims in this law suit.

**Excellent and Outstanding Annual Performance Appraisals and Awards**

33.      Mr. Dimas, who is an introvert, with a gentle and quiet demeanor, throughout his twenty-

two (22) years tenure to-date, at the DEA, has shown an unparalleled dedication to his duties,

and has carried out his duties superbly to an excellent level. He has worked so hard every work

day, to please his superiors and make the DEA successful in its mission. However, he has not

been fairly and appropriately been rewarded, but instead, he has been discriminated based on his

race, national origin, sex, color, and retaliated against, because of his prior EEO activities.

34.     Mr. Dimas, through his twenty-two (22) years tenure at the DEA, has consistently, and continuously maintained the highest level of decorum, and professionalism. He has dealt with and has accorded his superiors, with his utmost respect, and have dutifully followed all instructions they have given him, in spite of the fact that the same superiors, are discriminating, and retaliating against him, daily, in violation of his civil rights.

35.     None of Mr. Dimas' superiors have ever accused him of disobedience, insubordination or dereliction of his duties. None of his superiors, have ever accused him of lack of experience or incompetence. And none of his superiors, have ever accused him of, or complained about his performance of his duties, because Mr. Dimas was the best at what he does for the Agency.

36.     Mr. Dimas, a veteran, is highly disciplined, and experienced in what he does for the DEA. He loves his job, and he is exemplarily detailed oriented. He is a team player, and gets on well with everyone.

37.     There was no reason whatsoever, for the discriminatory, actions that Agency and its management supervisors, representatives and agents have continuously taken against Mr. Dimas over the years, and their retaliatory actions against him, since after he filed his first EEO Complaint against his superiors in 2011, and the second in 2012.

38.     For twenty-two (22) years, working for Agency, the only rating or classification Mr. Dimas has received in all his Annual Performance Appraisals by the Agency, from August 15, 2010 through September 30, 2021, has been, Excellent and Outstanding – his latest Performance Appraisals, covered the months of August 15, 2010 through September 30, 2021.

39.     In March 2002, after Mr. Dimas, a Computer Specialist, Security Workbench Unit, Information Security Section, Office of Security Programs, "processed over 600 requests, in four weeks, for access to multiple combinations of 74 integrated applications within the

M204/Teleview system," the then Chief, Security Workbench Unit requested that Mr. Dimas be "formally recognized with a $250.00 On-the-sport Service Award for his selfless contributions to DEA's law enforcement mission." Mr. Dimas, received that award.

40.     In May 2006, Mr. Dimas received an Award for his services, for the Small Business Administration ("SBA"), and the SBA's Chief Operating Officer congratulated Mr. Dimas: "…on receiving your recent award, and commend you for your individual contributions in furthering the utilization of small businesses within the Department of Justice. This is a significant accomplishment that required your dedication and commitment to supporting America's small businesses."

## Suspensions

41.     For the twenty-two (22) years Mr. Dimas worked for the DEA, he has been suspended twice. On one occasion, Mr. Dimas, was suspended for one (1) day, because he asked a white, Caucasian female coworker if she would like to go to lunch with him the female employee said no, and so, Mr. Dimas went to lunch without her, and without saying anything to her. Later, Mr. Dimas found out that his female coworker had told their supervisor that Dimas asked her out to lunch and whatever else. As a result, Mr. Dimas was given a 3-day notice of suspension without pay, which was later reduced to a 1-day suspension without day, by then deciding officer, Larry Reaves.

42.     The second occasion, was the unwarranted discriminatory and retaliatory animus-fueled 14-day suspension without pay, which was reduced to 11-day suspension, which is part of the adverse action claims in this law suit.

## Other Adverse Actions Taken by Defendant Against Plaintiff

43.     For twenty (22) years, working for the DEA, Mr. Dimas has applied for fifteen (15) open promotion vacancies. In all, he was never selected, but passed over, and the position given to a white Caucasian American coworker, in his unit, or a handpicked person, from another unit.

44.     On February 27, 2017, Mr. Dimas was notified that he was not selected for the position of Information Technology Specialist GS-2210-14, that was advertised under Vacancy Announcement Number H-IG-15-1598835-MP-JSD. The person who was promoted, is as usual, a white Caucasian American.

45.     The most recent rejection of his application, and notice that he was not selected for the position he applied and interview for, is dated, September 29, 2021.

46.     On February 3, 2017, Mr. Dimas received a memorandum, informing him that he will not eligible for a promotion, transfer, award, or nomination to the position of Field Trainer or Counselor for up to three years.

47.     In 2017, a notice of suspension for 14 days without pay, was issued to Mr. Dimas. The 14-day was reduced to a 11-days suspension without pay, from February 6 to 17, 2017, which Mr. Dimas served after he strongly challenged the premise and basis of that suspension.

48.     The charges against Mr. Dimas in that proposed 14-day suspension without pay, that was later reduced to 11-day suspension without pay, was nothing but an incredibly vicious, hostility and harassment, of Mr. Dimas, by his superiors.

49.     The charges against Mr. Dimas in that proposed 14-day suspension without pay, that was later reduced to 11-day suspension without pay, were deliberate, and intentionally orchestrated and concocted, to disgrace, humiliate, and intimidate Mr. Dimas.

50.     Mr. Dimas' superiors who were the architects of that proposed 14-day suspension without pay, that was later reduced to 11-day suspension without pay, knew that nothing in the

charges they brought against Mr. Dimas had nothing whatsoever, to do with his employment at

the DEA, as they were solely private marital matters, that was unsolicited brought to them, by a

vindictive wife, who Mr. Dimas had separated himself from. Yet, they used the uncorroborated

facts by any witness, from a third party-wife, against Mr. Dimas, because, they simply want to

destroy him, character wise, and also his career at the DEA and perhaps also in the federal

system.

51.    In the charges Mr. Dimas' superiors, brought against him in that proposed 14-day

suspension without pay, that was later reduced to 11-day suspension without pay, they were too

eager, and delighted to air and discuss one of their own employee's - Mr. Dimas' most intimate,

personal and confidential marital issues (not in any way related to his job or performance), and

using it against him without any regard at all, to his due process rights, or corroborative

evidence, simply because, in their insidious scheme, and animus filled minds, myopic eyes, those

provided them with information they needed to destroy him, character wise, and also his career

at the DEA and perhaps also in the federal system.

52.    In a stunning display of callousness, and abuse of supervisory power, Mr. Dimas'

superiors, discriminatory, acted in a hostile manner against by airing his most intimate, personal

and confidential marital issues, and filed it into his employment record - something Dimas

believes has never been done to any other employee, and something his supervisors – the same

supervisors, doing it to him, would never do to themselves or permit anyone to do to them, etc.

53.    My supervisors also, invidiously retaliated against Mr. Dimas by their continuous

hostility and harassment in form of unrelenting, unwarranted and concocted disciplinary actions -

aimed at creating an unfavorable record to tarnish his otherwise excellent employment record,

that they have generated as a pretext and cover, for their unlawful actions.

54.     The DEA, through its management supervisors, representatives and agents, unscrupulously hid behind the used the words "conduct unbecoming of …" in their 11-day suspension charges against Mr. Dimas, to cover the fact that they actually had no good reason for suspending him, because he did nothing wrong that related to his job and performance.

55.     Mr. Dimas' superiors, in their 11-day suspension charges against Mr. Dimas, unfairly and egregiously hid behind the used the words "conduct unbecoming of …" to give themselves permission that was unwarranted, to invade private areas of their employees' life, like they did to Mr. Dimas, that they knew, or should have known, have nothing at all to do with the business a federal Agency like the DEA, was created to do.

56.     Mr. Dimas' superiors, hid behind, and used "conduct unbecoming of …" to harass employees they do not like or have discriminatory and retaliatory animus against, like Mr. Dimas. It was clear that Mr. Dimas' superiors targeted Mr. Dimas and did everything they could to set him up to fail, given the detailed insidious actions that they surreptitiously took against Mr. Dimas, without his knowledge, that they filed in his employment record.

57.     Of all the people who were promoted over Mr. Dimas, at every vacancy and application he put forth, only one of them - Mr. Howard who was promoted to Unit Chief of the Communications Security (COMSEC), may have started at the DEA, before Mr. Dimas. The rest of the white Caucasian peer employees who were promoted over the years, over him, came after Mr. Dimas was already there. They have less tenure and experience on the job. Yet, they were promoted while Mr. Dimas was consistently and continuously passed over.

58.     None-Selection: Ms. Andrea D. McClain, who was a female, was selected even though Mr. Dimas has been on the job longer, and had more experience was promoted over Mr. Dimas for the position of Information Security Manager GS-2210-14.

59.     Some of the recent examples of promotions over Mr. Dimas, is the promotion of Mr. Jason T. Boyle to Supervisory Security Specialist position GS-0080-14 on or about February 7, 2018. Mr. Boyle is White Caucasian. And Patrick Gordon, who was promoted over Mr. Dimas, to Unit Chief GS-2210-14/Supervisory Information Technology Specialist position on or about December 11, 2018.

**<u>Revolving Door and Its Effect</u>**

60.     Mr. Mike McCommick who was one of Mr. Dimas' supervisors, and who played a consistent role in all the hostile, harassment, and discriminatory and retaliatory scheme against Mr. Dimas, that spanned many years, retired from the DEA, in 2017. However, he has returned back to the DEA, working as a contractor. He is now a Program Manager in Cyber Security, Investigation and Response Unit – the same unit Mr. Dimas still works in.

61.     Mr. Mike McCommick who was one of Mr. Dimas' supervisors, and who played a consistent role in all the hostile, harassment, and discriminatory and retaliatory scheme against Mr. Dimas, that spanned many years, retired from the DEA, in 2017. However, he has returned back to the DEA, working as a contractor.

62.     These same named actors, though no longer Mr. Dimas' supervisors, are still working for the DEA. They know, and still have direct contact and access to Mr. Dima' other supervisors who they worked in concert with, in discriminatorily and retaliatorily, investigated, filed OPR

reports, and unconscionably asked the AUSA in Virginia, to investigate and prosecute Mr. Dimas, for matters relating to his Mr. Dimas' private marital matters.

63.     These same named actors though no longer Mr. Dimas' supervisors, given their original positions at the DEA, and the kind of access they have had regarding Mr. Dimas' employment, and probably still have, still have the clout, if only by their continuous presence in Mr. Dimas' work unit, to influence the decisions of Mr. Dimas' present supervisors.

**Continuous Harassment Actions That Have Created a Hostile Work Environment**

64.     On March 1, 2016, Mr. Dimas went to work, but left, during his lunch time, due to ill health, to check himself in, at the Fort Belvoir Hospital, Emergency room, because he was having excruciating back pain that was impacting his ability to do his job that day.

65.     When he arrived at the hospital, Mr. Dimas immediately called the office and notified DEA Contract employee Adam Gibson (no longer with the DEA), and asked him to notify his First Line Supervisor Thomas G. Gregg, that he was at the Fort Belvoir Community Hospital Emergency Room, and that he had checked-in, because of severe back pain, that became unbearable.

66.     After calling Gibson, Mr. Dimas also called Thomas G. Gregg and notified him that he will probably be out for the rest of the week on sick leave – three days from 03/02/2021 through 03/04/2021. During that phone conversation with Thomas Gregg, he asked Mr. Dimas to call him "each day so that I will know how you are doing" which Mr. Dimas did.

67.     On that same day (March 1, 2016), not long after Mr. Dimas' separation from his wife, and after Mr. Dimas has left to check himself in at Fort Belvoir Emergency room, for some unheard-of reason, and totally inappropriate, and vindictive, Dimas' wife, whom he has just

separated from, went to his office to meet with Mr. Dimas' superiors, without Mr. Dimas'

knowledge, and while Mr. Dimas was at the Emergency room.

68.     According to Thomas G. Gregg, III, then Unit Chief, Validation, Integrity & Penetration

Response Unit, and Mike McCommick, Associate Deputy Chief Inspector Office of Security

Programs, Mr. Dimas' wife, who Mr. Dimas no longer lived with, "came to the office hoping to

speak to you. Since I was unaware of your location, your spouse expressed concern about your

health and wellbeing"

69.     Thomas G. Gregg, and Mike McCommick, did not ask Mr. Dimas' wife to come back

later, since her husband Mr. Dimas was not present, or tell her that they cannot speak or listen to

her, until Mr. Dimas was present, since they knew or should have known, that whatever she had

to tell them, obviously concerned details of their private marital life, that had nothing to do with

Mr. Dimas' employment or work at the DEA.

70.     When Mrs. Dimas started speaking, and it was immediately very clear to both Thomas G.

Gregg, and Mike McCommick, that what they were hearing from Mrs. Dimas, was nothing but a

vicious, unbelievable lies, and vindictive erring of their personal marital laundry in front of his

superiors, and something they clearly knew was so, reckless, dangerously inappropriate, and

solely intended to damage Mr. Dimas' character, and hurt his employment career with the DEA.

71.     Thomas G. Gregg, and Mike McCommick did not stop her, instead, they listened, and

encouraged her to keep talking, even though they knew too well, how wrong, inappropriate and

objectively unconscionable for a wife, to go to her husband's office and tell his superiors all

about their private marital life, without the husband's knowledge or consent.

72.     Thomas G. Gregg, and Mike McCommick knew that what Mrs. Dimas did with them, is something they would never countenance, if they were in Mr. Dimas' shoes. Yet, they were willing to accept her conduct, as proper, and deliberately used it to retaliate against Mr. Dimas, because of his prior EEO complaints against them, and because they have no regard whatsoever, for his civil rights, under U.S. Laws.

73.     Thomas G. Gregg, and Mike McCommick, deliberately, knowingly, and intentionally, abused their supervisory powers over Mr. Dimas for many years, outrageously, and egregiously, and inappropriately, emersed themselves in Mr. Dimas' marital issues, and insidiously, unlawfully, disingenuously, and inappropriately, linked it to Mr. Dimas' employment, and in so doing created a shockingly, continuous, and unbearable hostile work environment for Mr. Dimas to work in.

74.     Instead, because Thomas G. Gregg, and Mike McCommick, who already had discriminatory and retaliatory animus against Mr. Dimas, and were looking for a way to damage his reputation and his excellent work record, were willing to hear any negative accusation against him, even from an angry, physically and verbally abusive wife, whose actions, clearly showed lack of respect and loyalty and uncommon betrayal of her husband. The lies she was spouting, was music to Gregg, and Mike McCommick's ears, because they planned to use it against Mr. Dimas.

75.     On Friday March 4, 2016 when Mr. Dimas called Thomas G. Gregg, as he asked him to do, Greg asked Mr. Dimas to go directly to DEA Headquarters' and talk to Mr. Dimas' Third Level Supervisor Michael L. McCormick (Retired).

76.     On Monday March 7, 2016, when Mr. Dimas arrived at the DEA Headquarters, Michael

L, McCormick, and Richard D. Bendekovic (Retired) were already there waiting for him. Before

Mr. Dimas arrived, they deactivated his PIV badge access to the Headquarters, so he could not

get into the building, without the help of the security.

77.     The security had to let Mr. Dimas in. And after the security let Mr. Dimas in, on apparent

orders from Thomas G. Gregg, Mike McCommick, and Richard D. Bendekovic, the security also

took some of Mr. Dimas' personal effects from him. They took his three cassette recorders that

he had in his pocket. Mr. Dimas was shocked that his access to the DEA headquarters had been

cut off, and he was terrified of what they were going to do to him once inside, and the security

taking his personal effects – his cassette recorders, frightened and stressed him further.

78.     Mr. Dimas felt he was being treated like a criminal, even though he was not a criminal,

and has committed no crime at all. He also felt highly intimidated, humiliated, and dehumanized

by the way he was treated by Agency representatives – the security, Gregg, McCommick, and

Bendekovic, for no apparent or justified reason.

79.     Inside the DEA headquarters, Mr. Dimas met with McCormick and Bendekovic. They

presented him with a memorandum dated March 7, 2016, and asked him to sign it on the spot.

80.     In the memorandum McCormick and Bendekovic gave Mr. Dimas to sign, was language

that was cunningly used to coerce, and unduly pressure Mr. Dimas, into signing the

memorandum.

81.     In effect, the memorandum McCormick and Bendekovic, coerced Mr. Dimas to sign, was

for him to put himself up for counseling under the "Employee Assistance Program ("EAP").

82.     The EAP is a voluntary program. Mr. Dimas had no need whatsoever, for such counseling, and did not want to sign up for such. More importantly, Mr. Dimas never told or complained to McCormick and Bendekovic or any of his superiors for that matter, that he needed help from the EAP. And that McCormick and Bendekovic, who have continuously been hostile, and have treated him continuously over the years, with discriminatory and retaliatory animus, to suggest to him to do so at their own whim, terrified Mr. Dimas, and he felt powerless and extremely intimidated.

83.     Sensing that Mr. Dimas was not going to sign the memorandum, McCormick and Bendekovic then told Mr. Dimas that if he signed the memorandum, there will be no disciplinary action taken against him, on the three days sick leave from 03/02/2021 through 03/04/2021, he took on emergency basis, and for which he informed Gregg about, immediately he checked himself into the hospital for treatment of the severe back pain he was suffering from.

84.     Working in concert, against Mr. Dimas, Gregg, McCormick, and Bendekovic also promised Mr. Dimas, that if he signed the memorandum, that memorandum will not become part of his official personnel file.

85.     The memorandum also contained, and was based on all the lies Mr. Dimas' wife told them, about alleged medical issues Mr. Dimas supposedly was having, and other marital issues, which was repugnant, and all lies from a vindictive wife.

86.     While reading the memorandum Mr. Dimas felt intimidated, coerced, unduly pressured, and compelled by McCormick and Bendekovic, to sign the memorandum they prepared solely from false information about his alleged medical history they had received from his wife.

87.     Before asking Mr. Dimas to sign the pe-prepared memorandum before he arrived at the headquarters, McCormick and Bendekovic, never had any prior discussion with Mr. Dimas, about the reason(s) he was summoned to the DEA headquarters, the matter to be discussed, or the contents of the memorandum.

88.     At the meeting itself, McCormick and Bendekovic, never asked to know from Mr. Dimas, whether what his wife told them was true or not. They never asked him, to give them his side of the story – they just decided for him, and against his will, that he must go to counselling, because that was part of their hostile scheme, to concoct any dirt they can, no matter how vile and untrue, with the intent of damaging Mr. Dimas' employment carrier at the DEA.

89.     McCormick and Bendekovic, or any of Mr. Dimas' superiors who were part of continuous and sustained scheme to derail his carrier, initiated on their own, a "formal supervisory referral" of Dimas, to the EAP without any prior discussion with him, or claim that they have "observed any, or significant emotional distress and/or substantial degradation in [Mr. Dimas] on-the-job performance and/or conduct." They never claimed such, because they did not observe any such conduct from Dimas.

90.     McCormick and Bendekovic, but only, that it just happened that two, who are part of the same clique of his superiors, who Mr. Dimas had filed EEO complaints against, on two occasions, in 2011, and 2012, who, since then, had harbored discriminatory and retaliatory animosity against him, and who continuously have blocked Dimas from getting promoted (every promotion he applied for had been denied), apparently, and suddenly fell in love with Mr. Dimas, and out of their enormous kindness or "parental" care, provided him with a memorandum to sign, which states "the purpose of this memorandum is to express my concern for your welfare."

91.     Mr. Dimas' superiors, over the years, including, but not limited to, Gregg, McCormick

and Bendekovic, deliberately and intentionally blocked Mr. Dimas from progressing at the DEA,

if not also in any other government agency for that matter, given the amount of unfounded, and

unwarranted, negative, information they have put in his record, without his knowledge, because

of their insidious, discriminatory, and retaliatory animus against Mr. Dimas.

92.     Due to their actions, Mr. Dimas, may not be able to transfer to another federal Agency, or

even get employed in the private sector, were he to decide to leave the DEA, or try to get a job in

the private sector for any reason, because those negative record, his superiors have put in his

employment record, without his knowledge, even if untrue, may follow him, when reference is

sought, or employment background check, is conducted.

93.     Mr. Dimas' superiors, dumped into his employment record, hundreds of pages, with

knowingly and intentionally falsified contents, created, solely as evidence (false evidence) they

wrongfully, egregiously and unconscionably filed, and used to support every disciplinary action

they have insidiously concocted against Mr. Dimas, to invidiously punish him for his prior EEO

activities against them, even though they knew what they were doing to be unfair, hostile, and

unwarranted, as FOIA documents in response to Dimas' request show.

94.     Although Mr. Dimas knew, and suffered unwarranted, and unacceptable hostility in the

hands of some if not all his superiors, who were part of a scheme to derail his employment career

at the DEA, he did not know quite the length they have gone to do so, until later, through FOIA.

95.     When Mr. Dimas received through FOIA, documents his superiors, through the years,

had dumped in his employment record, without his knowledge, he also found out that the putrid,

salacious, lies about his marital life and matters concerning infidelity and sexual intercourse, that

21

his wife told Gregg, McCormick and Bendekovic (which was gossiped around and or circulated

between his managers and superiors), that was the basis of the 14-day suspension without pay,

which was reduced to 11-day suspension without pay, filed in his record, was not included, for

some unknown reason, to Mr. Dimas, in the documents FOIA office gave to Mr. Dimas.

96.     To-date, no one has explained to Mr. Dimas, how very private family matters concerning

marital problems with a spouse, somehow, is connected to an employee's employment, to the

extent that it is perpetually used against him, to deny him the benefits, privileges and enjoyment

of his employment, in violation of his civil rights, and Agency's own policies.

97.     Afraid, confused, coerced and cornered, humiliated, and feeling extremely intimidated by

McCormick and Bendekovic, Mr. Dimas, was powerless, and as a result of the undue influence

exerted over him by McCormick and Bendekovic, and also fearfully relying on the fact that they

told him that he will not be disciplined, and that they will not put the memorandum in his record,

Mr. Dimas reluctantly, against his will, signed the memorandum, dated March 7, 2016.

98.     As it turned out, both McCormick and Bendekovic intentionally deceived, and coerced

Mr. Dimas into signing the memorandum he did not want to sign, by making promises to him,

that they knew at the time they made it, that they were not going to keep.

99.     After unduly coercing Mr. Dimas to sign the memorandum, on the pretext that they will

not discipline him for the three days sick leave he took, or put the memorandum in his

employment record, they submitted the same memorandum dated March 7, 2016, that they made

him sign, to the Office of Professional Responsibility (OPR), who issued then issued Mr. Dimas

a proposed 14-day suspension without pay, and after Mr. Dimas, challenged it, they reduced the

suspension (which is totally unwarranted), to 11-days suspension, that was approved by his

superiors, Michael L. McCormick and Richard D. Bendekovic, including his first line supervisor Thomas G. Gregg.

100.    Mr. Dimas separated from his wife, and moved out of their marital home, on February 14, 2016. And between that time and March 1, 2016, with the encouragement of Mr. Dimas' superiors, his wife had visited Mr. Dimas' superiors Michael L. McCormick and Richard D. Bendekovic, including his first line supervisor Thomas G. Gregg, and perhaps others, twice, and had made accusatory statements to them, against Mr. Dimas, without him present, or his knowledge, until after the fact.

101.    After Mr. Dimas separated from his wife, his wife filed for spousal support, and child support for his granddaughter. After the hearing, in the Courthouse elevator, Mr. Dimas' wife, verbally and physically assaulted and battered Mr. Dimas, by grabbing and pulling, at his genitals, and seriously hurting him.

102.    As a result of the assault and battery on Mr. Dimas by his wife, the Virginia Family Court, on Mr. Dimas request, issued two separate protective orders against Dimas' wife. One on March 30, 2017 for two years, and the second on March 27, 2019.

103.    One of the charges Mr. Dimas' superiors made against him, in the proposed 14-day suspension without pay, that was reduced to 11-days without pay, was that Mr. Dimas had electronically recorded his telephone conversations with his wife, which was part of the false allegations, his DEA supervisors got from his wife.

104.    After suspending Mr. Dimas for 11-days without pay, despite Mr. Dimas' rebuttal to the charges against him, and without having any tangible physical evidence, other than what Dimas' wife told them, on two occasions, on May 10, 2016, and June 23, 2016, and without Mr. Dimas'

knowledge, the former Associate Deputy Chief Inspector (ADCI) Michael L. McCormick

(Retired, but came back and still works for the DEA as a contractor), contacted the Assistant

United States Attorneys ("AUSA") Eastern District of Virginia (EDVA) in Alexandria, Virginia

two times, and asked that the AUSA investigate and prosecute Mr. Dimas for the phone

recording allegations made against Mr. Dimas, by his wife.

105.    The two referrals to the AUSA, to investigate and prosecute Mr. Dimas, was also

supported by the Office of Professional Responsibility ("OPR") Acting Chief Inspector Brian M.

McKnight, Deputy Chief Inspector Sean Vereault, Richard D. Bendekovic (Retired, but came

back and still works for the DEA as a contractor).

106.    In 2016, McCormick and Bendekovic, worked for Sean Vereault, (Deputy Chief

Inspector (DCI), since September 9, 2015, who used these opportunities to retaliate against Mr.

Dimas, because of his prior EEO Complaints, against all of the named officials.

107.    Since his 2011, and 2012, EEO complaints against his superiors, including but not limited

to the named officials in this action, Mr. Dimas' superiors especially those named in this action,

have systematically, continuously, deliberately and intentionally have used discriminatory,

retaliatory and unlawful practices to damage his character and reputation, and to stymie Mr.

Dimas' career at the DEA, and thus, created a seemingly perpetual hostile work environment for

Mr. Dimas.

108.    Since his 2011, and 2012, EEO complaints against his superiors, including but not limited

to the named officials in this action, and due to the discriminatory, retaliatory and hostile

practices of Agency through its supervisory officials, Mr. Dimas has constantly felt targeted,

isolated, like a hostage, who is being held in a choke hold, and threatened with a gun pointed to

his head, because he has been supervised continuously for years, by superiors, who have done nothing but stymie his progress at the DEA, for no legitimate reason, and whose intent had also long been to frustrate and force him out of his job, which he cannot afford to do, because his family depends on him.

109.    From the OPR files that Mr. Dimas got through FOIA, he found that one of the documented false accusations that former Associate Deputy Chief Inspector (ADCI) Michael L. McCormick, and Unit Chief Thomas G. Gregg III generated against him, that was presented to OPR (without his knowledge), is that Mr. Dimas left work without supervisor prior approval. However, when Unit Chief Thomas G. Gregg III filed it with OPR, he knew, or should have known that it was untrue, because he himself, certified Mr. Dimas's time-sheet summary in web TA that Mr. Dimas worked for eight (8) hours on February 29, 2016. Yet, Gregg deliberately gave the OPR, so it could discipline Mr. Dimas, based on that false and inaccurate information.

110.    Through his twenty-two (22) years, working for the DEA, Mr. Dimas has never had any attendance issues. Every sick leave he had taken, had been approved. On March 1, 2016, he left work during his break time and checked himself in at the Fort Belvoir Hospital Emergency Room, due to excruciating back pain he was having. And, through all his Annual Performance Evaluation, for all the twenty-two years, **none**, has a negative comment on his attendance. Yet, unbeknown to Mr. Dimas, his superiors have been concocting spurious investigations on him, and filing it in his employment record, in a concerted effort to damage his career in the federal service, and perhaps elsewhere.

111.    Due to his back pain, Mr. Dimas medically uses a cane. He has a medically issued disability parking tag. His superiors know this, yet, they targeted, isolated, hounded, micromanaged, intimidated, and humiliated Mr. Dimas in any way they could, and in a manner

that shows an unbridled abuse of power by those who had supervisory power over him. And this abuse had been continuous for years.

112.     Through FOIA, Mr. Dimas later found that in May, 2016, Thomas G. Gregg, Michael L. McCormick, and Sean Vereault, without his knowledge, asked the Office of Professional Responsibility, to investigate Mr. Dimas. OPR Report of Investigation ("ROI") dated, May 12, 2016, was filed against Mr. Dimas. Among other things, the ROI stated:

4. "Allegations:  Federal Violation – Other, Attendance Misuse."

113.     Through FOIA, Mr. Dimas later found that in June, 2016, Thomas G. Gregg, Michael L. McCormick, and Sean Vereault without his knowledge, asked the Office of Professional Responsibility, to open an inquiry about Mr. Dimas. OPR inquiry dated, June 1, 2016, was filed against Mr. Dimas. Among other things, the inquiry stated:

"This inquiry pertains to: Federal Violation – Other, Attendance Misuse."

114.     Through FOIA, Mr. Dimas later found that in June, 2016, Thomas G. Gregg, Michael L. McCormick, and Sean Vereault, without his knowledge, asked the Office of Professional Responsibility, to investigate Mr. Dimas. OPR Report of Investigation ("ROI") dated, June 6, 2016, was filed against Mr. Dimas. Among other things, the ROI stated:

4. "Allegations:  Federal Violation – Other, Attendance Misuse."

115.     Through FOIA, Mr. Dimas later found that in June, 2016, Thomas G. Gregg, Michael L. McCormick, and Sean Vereault, without his knowledge, asked the Office of Professional Responsibility, to investigate Mr. Dimas. OPR Report of Investigation ("ROI") dated, June 9, 2016, was filed against Mr. Dimas. Among other things, the ROI stated:

4. "Allegations:  Federal Violation – Other, Attendance Misuse."

116.    Through FOIA, Mr. Dimas later found that in August, 2016, Thomas G. Gregg, Michael

L. McCormick, and Sean Vereault, without his knowledge, asked the Office of Professional

Responsibility, to investigate Mr. Dimas. OPR Report of Investigation ("ROI") dated, August 3,

2016, was filed against Mr. Dimas. Among other things, the ROI stated:

>    4. "Allegations:  Federal Violation – Other, Attendance Misuse, Failure to Pay
>    Just Debts."

### Count I Violation of Title VII 42 U.S.C. §§ 2000e, et seq.
### Disparate Terms and Conditions of Employment Based on Race and Color,

117.    Mr. Dimas hereby incorporates by reference the preceding paragraphs.

118.    Defendant engaged in unlawful employment practices in violation of Title VII, 42

U.S.C.§ 2000e-2(a) (1) and (a)(2) by subjecting Mr. Dimas to discriminatory treatments, and by

intentionally, and recklessly, blocking him from being promoted for twenty-two (22) years, even

though he is experienced, competent, and has carried out all his duties excellently as he has been

asked to do, based on his Race, and Color.

119.    Defendant is an employer as defined under 42 U.S. Code § 2000e (b).

120.    Mr. Dimas is Hispanic American and, thus, a member of a protected class.

121.    Mr. Dimas has not been promoted during about fifteen (15) times that he had applied for

a promotion vacancy during the past twenty-two years to-date, but his coworkers who are white

Caucasians, have been promoted over him, all the time, including those he h    that he had

worked for the DEA, and thus, have suffered numerous adverse employment action, and

specifically, those relevant in this action.

122.    At the time of the adverse employment actions, Mr. Dimas was performing his job duties satisfactorily.

123.    Mr. Dimas was treated differently than non-African American/Black employees outside of the protected class.

124.    Mr. Dimas is a Hispanic American man, and Agency, and its employees, management supervisors, representatives and agents were aware of this, and his race was a motivating factor in Defendant's unfair treatment and decisions not to promote him for twenty-two (22) years – thus keeping his career and position at the DEA at a "standstill" for twenty-two years to-date.

125.    Defendant engaged in unlawful employment practices in violation of Title VII, 42 U.S.C.§ 2000e-2(a) (1) and (a)(2) by subjecting Mr. Dimas to discriminatory treatments, denying him his civil rights, and equal conditions of employment under law, by passing over Mr. Dimas, every time he applied to be promoted, and promoting other, who he has seniority over based on tenure, and experience on the job, who are white Caucasians, because of his Race, and Color.

126.    Defendant's decisions not to promote Mr. Dimas during twenty-two (22) years of his dedicated service to Agency, has been intentionally to deprive Mr. Dimas of equal terms, benefits, and conditions of employment opportunities that his white, Caucasian peers and coworkers who worked for the DEA, received.

127.    Mr. Dimas, coworkers who are white Caucasian Americans, who were promoted over him whenever he applied to be promoted, were treated more favorably and were not subjected to the same adverse treatments as he was.

128.    Because of Defendant's supervisors, and agents' actions, Mr. Dimas suffered humiliation, lack of self-confidence, financial injury, emotional distress, depression and anxiety, and

sometime in 2014, developed high blood pressure (which he did not have when he started

working for DEA), as a result of the discriminatory way Defendant and its agents treated him.

Defendant and its agents, intentionally and unlawfully deprived Plaintiff of his rights and

privileges as their employee, on the basis of his race, and color, in violation of 42 U.S. Code §

2000e et seq.

129.    The unlawful employment practices complained herein were intentional.

130.    The unlawful employment practices complained herein were done against Mr. Dimas

with discriminatory and retaliatory animus, with malice or with reckless indifference to the

federally protected rights of Mr. Dimas, and Agency's own anti-discrimination policies.

131.    Defendants' unlawful and discriminatory actions against Mr. Dimas, are based on his

race, and color, in violation of Title VII. They were intentional, willful, malicious, and was

intended to injure Mr. Dimas, and was done with conscious disregard for Mr. Dimas' civil rights,

entitling him to an award of compensatory damages, and promotion to make him whole.

**<u>Count II Violation of Title VII 42 U.S.C. §§ 2000e, et seq.</u>**
**<u>Disparate Terms and Conditions of Employment Based on National Origin</u>**

132.    Mr. Dimas hereby incorporates by reference the preceding paragraphs.

133.    Defendant engaged in unlawful employment practices in violation of Title VII, 42

U.S.C.§ 2000e-2(a) (1) and (a)(2) by subjecting Mr. Dimas to discriminatory treatments, and by

intentionally, and recklessly, blocking him from being promoted for twenty-two (22) years, even

though he is experienced, competent, and has carried out all his duties excellently as he has been

asked to do, based on his National Origin.

134.    Defendant is an employer as defined under 42 U.S. Code § 2000e (b).

135.   Mr. Dimas is Hispanic American and, thus, a member of a protected class.

136.   Mr. Dimas has not been promoted during about fifteen (15) times that he had applied for a promotion vacancy during the past twenty-two years to-date, but his coworkers who are white Caucasians, have been promoted over him, all the time, including those he h   that he had worked for the DEA, and thus, have suffered numerous adverse employment action, and specifically, those relevant in this action.

137.   At the time of the adverse employment actions, Mr. Dimas was performing his job duties satisfactorily.

138.   Mr. Dimas was treated differently than non-African American/Black employees outside of the protected class.

139.   Mr. Dimas is a Hispanic American man, and Agency, and its employees, management supervisors, representatives and agents were aware of this, and his race was a motivating factor in Defendant's unfair treatment and decisions not to promote him for twenty-two (22) years – thus keeping his career and position at the DEA at a "standstill" for twenty-two years to-date.

140.   Defendant engaged in unlawful employment practices in violation of Title VII, 42 U.S.C.§ 2000e-2(a) (1) and (a)(2) by subjecting Mr. Dimas to discriminatory treatments, denying him his civil rights, and equal conditions of employment under law, by passing over Mr. Dimas, every time he applied to be promoted, and promoting other, who he has seniority over based on tenure, and experience on the job, who are white Caucasians, because of his National Origin.

141.   Defendant's decisions not to promote Mr. Dimas during twenty-two (22) years of his dedicated service to Agency, has been intentionally to deprive Mr. Dimas of equal terms, benefits, and conditions of employment opportunities that his white, Caucasian peers and coworkers who worked for the DEA, received.

142.    Mr. Dimas, coworkers who are white Caucasian Americans, who were promoted over him whenever he applied to be promoted, were treated more favorably and were not subjected to the same adverse treatments as he was.

143.    Because of Defendant's supervisors, and agents' actions, Mr. Dimas suffered humiliation, lack of self-confidence, financial injury, emotional distress, depression and anxiety, and sometime in 2014, developed high blood pressure (which he did not have when he started working for DEA), as a result of the discriminatory way Defendant and its agents treated him. Defendant and its agents, intentionally and unlawfully deprived Plaintiff of his rights and privileges as their employee, on the basis of his race, and color, in violation of 42 U.S. Code § 2000e et seq.

144.    The unlawful employment practices complained herein were intentional.

145.    The unlawful employment practices complained herein were done against Mr. Dimas with discriminatory and retaliatory animus, with malice or with reckless indifference to the federally protected rights of Mr. Dimas, and Agency's own anti-discrimination policies.

146.    Defendants' unlawful and discriminatory actions against Mr. Dimas, are based on his race, and color, in violation of Title VII. They were intentional, willful, malicious, and was intended to injure Mr. Dimas, and was done with conscious disregard for Mr. Dimas' civil rights, entitling him to an award of compensatory damages, and promotion to make him whole.

**Count III Violation of Title VII 42 U.S.C. §§ 2000e, et seq.**
**Disparate Terms and Conditions of Employment Based on Sex/Gender**

147.    Mr. Dimas hereby incorporates by reference the preceding paragraphs.

148.    Defendant engaged in unlawful employment practices in violation of Title VII, 42 U.S.C.§ 2000e-2(a) (1) and (a)(2) by subjecting Mr. Dimas to discriminatory treatments, and by

intentionally, and recklessly, blocking him from being promoted for twenty-two (22) years, even though he is experienced, competent, and has carried out all his duties excellently as he has been asked to do, based on his Sex/Gender.

149.    Defendant is an employer as defined under 42 U.S. Code § 2000e (b).

150.    Mr. Dimas is Hispanic American and, thus, a member of a protected class.

151.    Mr. Dimas has not been promoted during about fifteen (15) times that he had applied for a promotion vacancy during the past twenty-two years to-date, but his coworkers who are white Caucasians, have been promoted over him, all the time, including those he h    that he had worked for the DEA, and thus, have suffered numerous adverse employment action, and specifically, those relevant in this action.

152.    At the time of the adverse employment actions, Mr. Dimas was performing his job duties satisfactorily.

153.    Mr. Dimas was treated differently than non-African American/Black employees outside of the protected class.

154.    Mr. Dimas is a Hispanic American man, and Agency, and its employees, management supervisors, representatives and agents were aware of this, and his race was a motivating factor in Defendant's unfair treatment and decisions not to promote him for twenty-two (22) years – thus keeping his career and position at the DEA at a "standstill" for twenty-two years to-date.

155.    Defendant engaged in unlawful employment practices in violation of Title VII, 42 U.S.C.§ 2000e-2(a) (1) and (a)(2) by subjecting Mr. Dimas to discriminatory treatments, denying him his civil rights, and equal conditions of employment under law, by passing over Mr. Dimas, every time he applied to be promoted, and promoting other, who he has seniority over based on tenure, and experience on the job, who are white Caucasians, because of his Sex/Gender.

156.    Defendant's decisions not to promote Mr. Dimas during twenty-two (22) years of his dedicated service to Agency, has been intentionally to deprive Mr. Dimas of equal terms, benefits, and conditions of employment opportunities that his white, Caucasian peers and coworkers who worked for the DEA, received.

157.    Mr. Dimas, coworkers who are white Caucasian Americans, who were promoted over him whenever he applied to be promoted, were treated more favorably and were not subjected to the same adverse treatments as he was.

158.    Because of Defendant's supervisors, and agents' actions, Mr. Dimas suffered humiliation, lack of self-confidence, financial injury, emotional distress, depression and anxiety, and sometime in 2014, developed high blood pressure (which he did not have when he started working for DEA), as a result of the discriminatory way Defendant and its agents treated him. Defendant and its agents, intentionally and unlawfully deprived Plaintiff of his rights and privileges as their employee, on the basis of his race, and color, in violation of 42 U.S. Code § 2000e et seq.

159.    The unlawful employment practices complained herein were intentional.

160.    The unlawful employment practices complained herein were done against Mr. Dimas with discriminatory and retaliatory animus, with malice or with reckless indifference to the federally protected rights of Mr. Dimas, and Agency's own anti-discrimination policies.

161.    Defendants' unlawful and discriminatory actions against Mr. Dimas, are based on his race, and color, in violation of Title VII. They were intentional, willful, malicious, and was intended to injure Mr. Dimas, and was done with conscious disregard for Mr. Dimas' civil rights, entitling him to an award of compensatory damages, and promotion to make him whole.

**Count IV Violation of Title VII 42 U.S.C. §§ 2000e, et seq.**
**Harassment Hostile Work Environment Based on Race**
**National Origin, Color and Sex/Gender**

162.    Plaintiff hereby incorporates by reference the preceding paragraphs.

163.    Defendant engaged in unlawful employment practices in violation of Title VII, 42

U.S.C.§ 2000e-2(a) (1) and (a)(2) by subjecting him to harassment and a hostile work

environment and by discriminating against Mr. Dimas in its promotion practices, based on his

Race, Color, National Origin, and Sex/Gender.

164.     Defendant harassed and subjected Mr. Dimas to harassment, disparate working

conditions and a hostile work environment through its management supervisors, and agents, that

prevented Mr. Dimas from not being promoted, being suspended, for no reason, his private,

confidential marital issues used against him, and filed in his employment record so as to damage

his career.

165.    Defendant, harassed and subjected Mr. Dimas to harassment, disparate working

conditions and a hostile work environment through its management supervisors, and agents,

when Defendant's management supervisors, and agents, continuously filed inquiries,

investigations, and reporting such with the OPR, without justification, and put them in his

employment record.

166.    Defendant, harassed and subjected Mr. Dimas to harassment, disparate working

conditions and a hostile work environment through its management supervisors, and agents,

when it referred Mr. Dimas to the AUSA in Virginia to investigate Mr. Dimas, and prosecute

him.

34

167.    Defendant's actions against Mr. Dimas, amounted to harassment and hostility, and they created a hostile work environment for Mr. Dimas to work in.

168.    Mr. Dimas found those actions against him very repugnant and unacceptable. He reported them, he complained about them, including other discriminatory practices complained of herein.

169.    Because of Defendant's supervisors, and agents' actions, Mr. Dimas suffered humiliation, lack of self-confidence, financial injury, emotional distress, depression and anxiety, and sometime in 2014, developed high blood pressure (which he did not have when he started working for DEA), as a result of the discriminatory way Defendant and its agents treated him. Defendant and its agents, intentionally and unlawfully deprived Plaintiff of his rights and privileges as their employee, on the basis of his race, and color, in violation of 42 U.S. Code § 2000e et seq.

170.    Defendant's actions are in violation of the law and as such Mr. Dimas is entitling him to an award of compensatory damages, and promotion to make him whole.

## Count V Violation of Title VII, 42 U.S.C. §§ 2000e, et seq.
### Retaliation

171.    Plaintiff hereby incorporates by reference the preceding paragraphs.

172.    Plaintiff engaged in activity protected by Title VII when he complained against his supervisors who discriminated against him by not promoting him, for over twenty-two years.

173.    Defendant retaliated against Mr. Lambert, by terminating him after he reported Mr. Gregg, and other of his supervisors named herein. They retaliated against him because of Mr. Dimas' prior EEO Complaints against him, in violation of Title VII of the Civil Rights Act of 1964.

174.    Defendants' actions were intentional, with reckless indifference to Plaintiff's rights.

Because of Defendant's supervisors, and agents' actions, Mr. Dimas suffered humiliation, lack of

self-confidence, financial injury, emotional distress, depression and anxiety, and sometime in

2014, developed high blood pressure (which he did not have when he started working for DEA),

as a result of the discriminatory way Defendant and its agents treated him. Defendant and its

agents, intentionally and unlawfully deprived Plaintiff of his rights and privileges as their

employee, on the basis of his race, and color, in violation of 42 U.S. Code § 2000e et seq.

175.Defendant's actions are in violation of the law and as such Mr. Dimas is entitling him to an

award of compensatory damages, and promotion to make him whole.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Mr. Federico Dimas prays the Court for the following relief:

(a)     Rule in Mr. Dimas favor as to all Counts on Count I

(b)     Award Mr. Dimas Reasonable and appropriate Compensatory Damages and Promote him to GS 14.

(c)     Award Mr. Dimas Reasonable attorneys' fees and costs.

(d)     Award Mr. Dimas such other, and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

PLAINTIFF DEMANDS A TRIAL BY JURY


Respectfully submitted this 20th day of October, 2021


/s/_____
Stephen Christopher Swift (DC Bar #428459
Charity C. Emeronye Swift (DC Bar #198209
Swift & Swift, Attorneys at Law, P.L.L.C.
Suite 200
2121 Eisenhower Avenue
Alexandria, Virginia 22314-4688
Telephone: (703) 418 – 0000
Facsimile: (703) 535 – 8205
E-mail: steve@swift.law.pro
Email: charity@swift.law.pro
Attorney for Plaintiff, Federico Dimas